IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-26

No. 234PA20

Filed 11 March 2022

STATE OF NORTH CAROLINA

v.

KELVIN ALPHONSO ALEXANDER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 271 N.C. App. 77 (2020), affirming an order entered on 1 October 2018 by Judge Henry W. Hight, Jr., in Superior Court, Warren County, denying defendant's motion for postconviction DNA testing. Heard in the Supreme Court on 5 October 2021.

*Joshua H. Stein, Attorney General, by Kristin J. Uicker, Assistant Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Anne M. Gomez, Assistant Appellate Defender, for defendant-appellant.*

*Julie Boyer, Attorney at Law, by Julie C. Bower; Kelly M. Dermody; and Evan J. Ballan, for The Innocence Network, amicus curiae.*

ERVIN, Justice.

¶ 1     This case arises from a motion for postconviction DNA testing pursuant to N.C.G.S. § 15A-269 filed by defendant Kelvin Alphonso Alexander over two decades after he entered a plea of guilty to second-degree murder. At the conclusion of a

hearing held for the purpose of considering defendant's motion, the trial court entered an order denying defendant's request for postconviction DNA testing on the grounds that defendant had failed to show that the requested testing would be material to his defense. On appeal, we have been asked to determine (1) if defendants who are convicted on the basis of a guilty plea are entitled to obtain postconviction DNA testing pursuant to N.C.G.S. § 15A-269 and (2) if so, whether defendant made the necessary showing of materiality in this case. After careful consideration of the record in light of the applicable law, we affirm the decision of the Court of Appeals.

## I.    Factual Background

### A. Substantive Facts

On the morning of 17 September 1992, Carl Boyd was found dead behind the counter of the Amoco service station that he managed in Norlina. After being dispatched to the Amoco station, Deputy Sheriff William H. Aiken of the Warren County Sheriff's Office, who was accompanied by Special Agent D.G. McDougall of the State Bureau of Investigation, discovered that Mr. Boyd had been shot multiple times. A subsequent autopsy revealed that Mr. Boyd had sustained four gunshot wounds to his back, abdomen, and forearm, with the medical examiner having expressed the opinion that these wounds had been inflicted using a .22 caliber handgun.

¶ 3        In the course of their examination of the Amoco station, Deputy Aiken and Special Agent McDougall seized several items of evidence, including a .22 caliber projectile and three .22 caliber shell casings that were discovered on the service station floor. In addition, Special Agent McDougall collected eighteen latent print lifts from various parts of the service station. An SBI analyst later determined that these lifts contained five usable latent fingerprints and two usable latent palm prints and that three of the fingerprints belonged to Mr. Boyd and his wife. The firearm that had been used to kill Mr. Boyd was never recovered.

¶ 4        On 19 September 1992, Deputy Aiken interviewed Orlinda Lashley, who had been in the crowd outside the Amoco station while the investigating officers were there. According to a subsequent report prepared by Special Agent R.G. Sims of the State Bureau of Investigation, Ms. Lashley told Deputy Aiken that she had arrived at the Amoco station at approximately 7:15 a.m. and had been standing next to the gas tanks when she heard shouting, followed by two loud noises, emanating from the interior of the service station. At that point, according to Ms. Lashley, two men emerged from the front of the store, one of whom Ms. Lashley identified by name as defendant. As defendant emerged from the Amoco station, defendant told Ms. Lashley, "Hold it bitch, if you make a move, you're dead," after which he and the other man got into a vehicle that they were using and drove away. Ms. Lashley claimed to have left to go home before returning to the service station, in which she found Mr.

Boyd, who died while holding her hands. After walking to another business across the street and contacting law enforcement officers, Ms. Lashley noticed that defendant was in the crowd that had gathered outside the Amoco station.

¶ 5    In light of the information that Ms. Lashley had provided, Deputy Aiken placed defendant under arrest. At the time that he was questioned by investigating officers, defendant denied having had any involvement in the killing of Mr. Boyd and claimed that he had been at home in bed at the time of the robbery and murder. Defendant did, on the other hand, admit to having gone to the Amoco station and to having stood outside while investigating officers were in the building, although he denied having ever entered the service station after Mr. Boyd began operating the business. Tanika Brown, the teenage daughter of defendant's father's girlfriend, who lived with defendant, told Special Agent Sims that defendant had been in bed on the morning of Mr. Boyd's death and that she had spoken to defendant at approximately 7:10 a.m. or 7:15 a.m. about borrowing a gold chain from him given that school photographs were to be taken that day.

¶ 6    On 21 September 1992, Deputy Aiken and Special Agent Sims interviewed Ms. Lashley for a second time. Although the investigating officers showed her a photographic lineup that contained images of six suspects, including defendant, Ms. Lashley failed to identify any of the individuals depicted in the photographic array. At the time of defendant's sentencing hearing, Ms. Lashley explained that, even

though she had recognized defendant's photo when she was shown the photographic lineup, she had not pointed him out because she had been asked to identify the second person that she had seen leaving the Amoco station rather than defendant. After the second interview, Ms. Lashley provided a formal statement describing what she had seen, which was handwritten by Special Agent Sims and which Ms. Lashley annotated and signed.

¶ 7    In this written statement, Ms. Lashley said that, after leaving the Amoco station, she had parked in a nearby driveway to clean herself and change her clothes,[1] at which point her "conscience was kicking in" and she "knew [she] had to go back." In light of this attack of conscience, Ms. Lashley said that she drove to the F&S Convenience Store, which was located across the street from the Amoco station, where she learned that Mr. Boyd had been shot. After determining that investigating officers and emergency medical personnel had been dispatched to the wrong location, Ms. Lashley claimed to have called 911 and informed the dispatcher that the officers and emergency medical personnel were needed at the Amoco station. According to Ms. Lashley, she accompanied the paramedics into the service station, where she saw Mr. Boyd's body, but did not "administer aid or touch him in any way." Ms. Lashley stated that she had not spoken to investigating officers at that time because she "was

---

[1] At defendant's sentencing hearing, Ms. Lashley testified that she was scared and had "lost control of her bladder."

scared to death," that she had known defendant for "most of his life," that defendant had gone to school with her nephew, and that she knew defendant's father. Although she was shown the photographic lineup again at the conclusion of this second interview, Ms. Lashley again failed to identify any of the individuals who were depicted in that array.

¶ 8     On 20 October 1992, Special Agent McDougall interviewed Nell and Bonnie Ricks concerning a robbery that had occurred at a rest area located on Interstate 85 on the morning of Mr. Boyd's murder. At the time of that conversation, Mr. Ricks stated that, at approximately 7:00 a.m., he and his wife had stopped at the rest area, which Deputy Aiken claimed to be a "two or three minutes' drive" from the Amoco station, and that he was using the restroom when a Black male held him at gunpoint using what appeared to be a sawed-off shotgun or .22 caliber rifle and demanded to be given Mr. Ricks' wallet. After handing over his wallet to the assailant, Mr. Ricks remained in the restroom for another minute before returning to his car and calling law enforcement officers. Ms. Ricks told Special Agent McDougall that she had seen a Black man who was at least six feet tall, slender, and approximately twenty-five years old exit the rest area building and enter an older, medium-sized white car. Although Ms. Ricks was later shown a photographic lineup that contained defendant's image, Ms. Ricks did not identify anyone depicted in the lineup as the person that she had seen at the rest area.

**B. Procedural History**

On 19 October 1992, the Warren County grand jury returned bills of indictment charging defendant with first-degree murder and robbery with a dangerous weapon. In the course of pretrial proceedings, the prosecutor informed defendant's trial counsel that the State had a "credible eyewitness" who could identify defendant as Mr. Boyd's killer and that there was a "substantial possibility that [defendant] would be convicted of first-degree murder." The prosecutor did not, however, provide defendant's trial counsel with Ms. Lashley's name or give defendant's trial counsel access to either Special Agent Sims' report concerning Deputy Aiken's initial interview with Ms. Lashley or the handwritten statement that Ms. Lashley had annotated and signed at the time of her second interview.

The charges against defendant came on for trial before Judge Knox V. Jenkins, Jr., at the 15 November 1993 criminal session of Superior Court, Warren County. On 16 November 1993, during the process of selecting a death-qualified jury, defendant entered into a plea agreement with the State pursuant to which he agreed to plead guilty to second-degree murder in return for the dismissal of the robbery with a dangerous weapon charge, with sentencing to be left to Judge Jenkins' discretion. In addition, the State agreed to produce its eyewitness at the sentencing hearing, during which she could be cross-examined by defendant's trial counsel. After accepting

defendant's guilty plea, Judge Jenkins scheduled a sentencing hearing for the following day.

In the course of the ensuing sentencing hearing, Ms. Lashley testified in a manner that was generally consistent with the written statement that she had signed and annotated at the time of her second interview with the investigating officers. Among other things, Ms. Lashley reiterated that, after leaving the Amoco station, she had stopped to clean herself and change clothes before returning to the F&S Convenience Store and calling for emergency assistance and that she had only entered the Amoco station with the paramedics for a brief period of time before returning to the exterior of the building. Finally, Ms. Lashley testified that she had known defendant "[p]ractically all his life" and added that their families had been close for as long as she could remember.

Defendant's father, Willie Alexander, testified at the sentencing hearing concerning defendant's background and education without making any mention of defendant's whereabouts on the date of Mr. Boyd's death. In the course of his sentencing argument, defendant's trial counsel commented that Ms. Lashley had "presented a slightly different version" of what happened during the photo lineup proceedings, mentioned Ms. Lashley's assertion that she had not been asked to identify defendant, and highlighted testimony from a classmate of Ms. Lashley's nephew to the effect that, while he and defendant "may have [had] a slight crossing

of paths" in high school, they had graduated four years apart. Finally, defendant's trial counsel pointed to Ms. Lashley's testimony that she had not lived in Warren County from 1977, when defendant was five years old, to 1990, when defendant was eighteen years old. Prior to announcing his sentencing decision, Judge Jenkins observed that, in light of her demeanor, manner, and appearance, he believed that Ms. Lashley had "an obvious lack of any interest, bias[,] or prejudice" and "appeared to be fair in her testimony." At the conclusion of the sentencing hearing and after finding the existence of two aggravating factors and no mitigating factors, Judge Jenkins entered a judgment sentencing defendant to a term of life imprisonment.

¶ 13    On 20 November 2002, defendant, who was proceeding *pro se*, filed a motion for appropriate relief in which he asserted claims for ineffective assistance of counsel and prosecutorial misconduct. On 4 April 2006, an evidentiary hearing was held before Judge R. Allen Baddour, Jr., for the purpose of considering the issues raised by defendant's motion for appropriate relief. At the 4 April 2006 hearing, the prosecutor testified that the State's case against defendant "rested almost exclusively on Ms. Lashley's identification" of defendant as one of the men whom she had seen leaving the Amoco station and that he "presumed" that, in the event that Ms. Lashley had been unable to identify defendant as one of the perpetrators of the murder, Judge Jenkins would have permitted defendant to withdraw his guilty plea.

¶ 14        Marvin Rooker, who served as one of defendant's trial attorneys, testified that, although he had been aware that there were some potential issues relating to Ms. Lashley's ability to identify defendant after viewing the photographic lineup, he believed that her testimony at the sentencing hearing had been "very credible" and that she had been "a good witness for the State." Frank Ballance, who served as defendant's other trial counsel, indicated that he had understood that defendant would have been allowed to withdraw his guilty plea in the event that the State's alleged eyewitness had failed to testify. Mr. Alexander testified that defendant had been at home at the time of Mr. Boyd's death and that he had told defendant's trial counsel about his availability as an alibi witness prior to the entry of defendant's guilty plea, with Mr. Rooker confirming that, even though he was aware of the possibility that defendant might be able to mount an alibi defense, defendant had elected to plead guilty anyway.

¶ 15        Dominic White, who had pled guilty to federal criminal charges in 2004 and remained in federal custody, testified that, while he was being debriefed by federal authorities, he had told them that, in 1992, his friend, John Terry, had confessed to having robbed and shot the owner of a convenience store in Warren County. Mr. White said that, while he and Mr. Terry had been driving through the area, Mr. Terry had stopped the car, run into the woods, and returned with what appeared to Mr. White to be a .22 caliber short-barrel assault rifle, which Mr. Terry claimed to have

been the firearm used in the robbery and shooting. On the other hand, Mr. Terry, who also testified at the evidentiary hearing, denied having shot Mr. Boyd or told Mr. White that he had done so and claimed that he did not know defendant and had never met him.

¶ 16        On 8 January 2007, Judge Baddour entered an order denying defendant's motion for appropriate relief on the grounds that, at the time that defendant had entered his guilty plea, "he was fully aware that the State claimed it had an eyewitness" even though his trial counsel did not know the witness' identity and had not had time to investigate her story, with the purpose of her testimony at sentencing having been to allow defendant "the opportunity to assess her testimony and credibility." In addition, Judge Baddour determined that, by failing to seek to withdraw his guilty plea following Ms. Lashley's testimony, defendant had expressed satisfaction "with the nature and quality of the testimony of [Ms.] Lashley" and that, even if defendant's trial counsel had provided him with deficient representation in light of their failure to learn Ms. Lashley's identity until the time of the sentencing hearing, there was "no reasonable probability" that, in the absence of that error, defendant would not have entered a plea of guilty.

¶ 17        On 18 March 2016, defendant filed a motion seeking postconviction DNA testing pursuant to N.C.G.S. § 15A-269 in which he requested the entry of an order compelling the performance of DNA and fingerprint testing on the three shell casings

and projectile that had been found in the Amoco station on the theory that, in the event that Mr. Terry's DNA or fingerprints could be detected on these items, such a result would exonerate defendant. On 1 October 2018, the trial court entered an order denying defendant's motion on the grounds that defendant had "failed to show that all the requirements of [N.C.G.S. §] 15A-269 ha[d] been met" and that "the evidence sought is not material in this post-conviction setting" given that "the firearm which fired the bullet that killed Carl Eugene Boyd has never been recovered and the requested DNA testing would not reveal the identity of who fired th[e] firearm [that] killed Carl Eugene Boyd." Defendant noted an appeal to the Court of Appeals from the trial court's order.

## C. Court of Appeals Decision

¶ 18        In seeking relief from the trial court's order before the Court of Appeals, defendant contended that the trial court had erred by determining that the requested DNA evidence was not material. Arguing in reliance upon the Court of Appeals' earlier decision in *State v. Randall*, defendant asserted that the proper standard for assessing materiality in cases involving guilty pleas focused upon the extent to which "there is a reasonable probability that DNA testing would have produced a different outcome"—specifically, that the defendant "would not have pleaded guilty and otherwise would not have been found guilty." 259 N.C. App. 885, 887 (2018). Defendant contended that, had a third person's DNA had been found on the shell

casings and projectile and defendant's DNA not been detected there, those results would have provided significant support for a conclusion that someone else had been involved in the commission of the crime that defendant had been convicted of committing. In defendant's view, had such evidence been available and had he known about the "numerous problems" that tended to undermine Ms. Lashley's identification testimony, there was a reasonable probability that he would not have entered a guilty plea. In addition, defendant asserted that there was a reasonable probability that, had he insisted upon going to trial instead of pleading guilty, he would not have been convicted given the newly available DNA evidence and the other exculpatory evidence that was available to him.

¶ 19     In response, the State contended that defendant was not entitled to seek postconviction DNA testing because he had entered a guilty plea. In the State's view, defendant's guilty plea deprived him of the ability to make the necessary showing of materiality given that he had not presented a "defense" for purposes of N.C.G.S. § 15A-296(a)(1) and could not have obtained a "more favorable verdict" in the absence of a decision with respect to the issue of guilt rendered by a jury. In addition, the State asserted that the Court of Appeals' decision in *Randall* had been overruled in *State v. Sayre*, 255 N.C. App. 215 (2020), *aff'd per curiam*, 371 N.C. 468 (2018) (observing that, "by entering into plea agreement with the State and pleading guilty, [the] defendant presented no 'defense' pursuant to [N.C.G.S.] § 15A-269(a)(1)").

Finally, the State argued that, even if defendant's guilty plea did not preclude him from seeking postconviction DNA testing, he had failed to make the necessary showing of materiality given that the evidence of his guilt was overwhelming and given that the presence of a third party's DNA upon the relevant items of evidence "would show at best that someone other than [d]efendant touched the shell casings or projectile at some time [and] for some reason that need not have been related to the robbery-murder." In the same vein, the State noted that Mr. White's testimony, which had been given more than a decade after the entry of defendant's guilty plea, could not support a finding of materiality given that the evidence in question had not been available at the time that defendant pled guilty and was sentenced.

¶ 20    In rejecting the State's argument that a defendant who pleads guilty is not entitled to seek postconviction DNA testing pursuant to N.C.G.S. § 15A-269, the Court of Appeals concluded that its prior decision in *Randall* was controlling with respect to this issue and that "there may be rare situations where there is a reasonable probability that a defendant would not have pleaded guilty in the first instance and would have not otherwise been convicted had the results of DNA testing" been available at the time of the defendant's guilty plea. *State v. Alexander*, 271 N.C. App. 77, 79 (2020) (citing *Randall*, 259 N.C. App. at 887). After acknowledging that the use of the word "verdict" might tend to suggest that the General Assembly intended to limit the availability of postconviction DNA testing to cases in which the

defendant had been convicted based upon a decision by a jury, the Court of Appeals concluded that "there is a strong counter-argument that the General Assembly did not intend for the word 'verdict' to be construed in such a strict, legal sense" and that the General Assembly had, instead, "intended for 'verdict' to be construed more broadly, to mean 'resolution,' 'judgment' or 'outcome' in a particular matter," particularly given that a decision to adopt the more restrictive reading upon which the State relied might lead to the absurd result that postconviction DNA testing would not be available to a defendant who had been convicted at the conclusion of a bench trial. *Id*. at 80; *see id*. at 80 n. 1 (citing *State v. Hemphill*, 273 N.C. 388, 389 (1968); N.C.G.S. § 1A-1, Rule 52 (2015)). Finally, the Court of Appeals concluded that this Court's decision to affirm the Court of Appeals' decision in *Sayre* did not constitute acceptance of the State's position that postconviction DNA testing was not available to defendants who had been convicted on the basis of a guilty plea rather than a jury verdict because that question had not been before the Court in *Sayre*. *Id*. at 81.

¶ 21      After determining that defendant's guilty plea did not preclude him from seeking postconviction DNA testing, the Court of Appeals held that the trial court had correctly concluded that defendant had failed to make the necessary showing of materiality. *Id*. at 81–82. In support of this decision, the Court of Appeals pointed to the "substantial evidence of [d]efendant's guilt," including (1) Ms. Lashley's

testimony; (2) defendant's admission that he had been at the Amoco station on the date of the murder; and (3) defendant's guilty plea. *Id.* In addition, the Court of Appeals concluded that the mere presence of a third party's DNA on the evidence that defendant sought to have tested did not necessarily exonerate him given the existence of a number of alternative explanations for the presence of a third party's DNA on that evidence. *Id.* at 82.

¶ 22 In a separate opinion concurring in the result, then-Judge Berger opined that defendants who had been convicted on the basis of a plea of guilty plea did not have the right to seek postconviction DNA testing. *Id.* at 82 (Berger, J., concurring). As an initial matter, Judge Berger disputed the validity of the Court of Appeals' determination that this Court's decision in *Sayre* was limited to the issue of materiality. *Id.* at 83–85. In addition, Judge Berger noted that, by pleading guilty, defendant had "waive[d] all defenses other than that the indictment charges no offense[,]" with the defenses that defendant had waived by entering a guilty plea having included the right to seek postconviction DNA testing. *Id.* at 85 (quoting *State v. Smith*, 279 N.C. 505, 506 (1971)). Judge Berger asserted that his colleagues had construed the term "verdict" in an excessively broad manner, that the relevant statutory expression should be understood in accordance with its "plain meaning," and that, in order for a defendant to make the necessary showing of materiality, "there must have been a verdict returned by a jury." *Id.* at 86–87. Finally, after

noting that N.C.G.S. § 15A-269(b)(3) provides that a defendant seeking to obtain DNA testing must execute an affidavit of innocence, Judge Berger opined that "[a] defendant who, under oath, admits guilt to a charged offense, cannot thereafter provide a truthful affidavit of innocence" as required by N.C.G.S. § 15A-269(b)(3). *Id.* at 87. This Court allowed defendant's petition for discretionary review of the Court of Appeals' decision on 12 August 2020.

## II.  Substantive Legal Analysis

### A. Standard of Review

¶ 23  This Court reviews decisions of the Court of Appeals for errors of law. N.C. R. App. P. 16(a); *State v. Melton*, 371 N.C. 750, 756 (2018). "In reviewing a denial of a motion for postconviction DNA testing, '[f]indings of fact are binding on this Court if they are supported by competent evidence and may not be disturbed absent an abuse of discretion.' " *State v. Lane*, 370 N.C. 508, 517 (2018) (alteration in original) (quoting *State v. Gardner*, 227 N.C. App. 364, 365–66 (2013)). "A trial court's determination of whether defendant's request for postconviction DNA testing is 'material' to his defense, as defined in N.C.G.S. § 15A-269(b)(2), is a conclusion of law, and thus we review de novo [a] trial court's conclusion that defendant failed to show the materiality of his request." *Id.* at 517–18.

**B. Availability of Postconviction DNA Testing Following a Guilty Plea**

¶ 24        According to N.C.G.S § 15A-269, a convicted defendant is entitled to obtain postconviction DNA testing of evidence that:

> (1)  Is material to the defendant's defense.
>
> (2)  Is related to the investigation or prosecution that resulted in the judgment.
>
> (3)  Meets either of the following conditions:
>
> > a.  It was not DNA tested previously.
> >
> > b.  It was tested previously, but the requested DNA test would provide results that are significantly more accurate and probative of the identity of the perpetrator or accomplice or have a reasonable probability of contradicting prior test results.

N.C.G.S. § 15A-269(a) (2021). A trial court is required to allow a request for postconviction DNA testing in the event that the criteria specified in N.C.G.S. § 15A-269(a) have been established and that:

> (2)  If the DNA testing being requested had been conducted on the evidence, there exists a reasonable probability that the verdict would have been more favorable to the defendant; and
>
> (3)  The defendant has signed a sworn affidavit of innocence.

N.C.G.S. § 15A-269(b). "Materiality" as used in the statutory provisions governing postconviction DNA testing should be understood in the same way that "materiality" is understood in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, *Lane*, 370

N.C. at 519, with the relevant inquiry being whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

¶ 25          The initial issue that we need to address in evaluating the validity of defendant's challenge to the Court of Appeals' decision to uphold the trial court's order is whether our decision in *Sayre* should be understood to deprive defendants convicted on the basis of guilty pleas of the right to seek and obtain postconviction DNA testing even if they are otherwise able to satisfy the applicable statutory requirements.    The majority at the Court of Appeals held in *Sayre* that the defendant's "bare assertion that testing the identified evidence would 'prove that [he] is not the perpetrator of the crimes' is not sufficiently specific to establish that the requested DNA testing would be material to his defense." *State v. Sayre*, No. COA17-68, 2017 WL 3480951, at *2 (N.C. Ct. App. Aug. 15, 2017) (unpublished).  In addition, the Court of Appeals observed that, "by entering into a plea agreement with the State and pleading guilty, [the] defendant presented no 'defense' pursuant to [N.C.G.S.] § 15A-269(a)(1)" and did not have the right to seek or obtain postconviction DNA testing. *Id.* at *2. In light of his belief that defendant had, in fact, made a sufficient showing of "materiality," Judge Murphy dissented from his colleagues' decision and concluded that the case should have been remanded to the trial court for further

proceedings. *Id.* at *3 (Murphy, J., dissenting). The defendant noted an appeal from the Court of Appeals' decision to this Court based upon Judge Murphy's dissent.

¶ 26      According to well-established North Carolina law, "[w]hen an appeal is taken pursuant to [N.C.G.S.] § 7A-30(2), the only issues properly before the Court are those on which the dissenting judge in the Court of Appeals based his dissent." *Clifford v. River Bend Plantation, Inc.*, 312 N.C. 460, 463 (1984). In light of that fact, the only issue before this Court in *Sayre* was whether the defendant had sufficiently alleged that the performance of postconviction DNA testing would be "material." For that reason, our decision in *Sayre* did not address, much less resolve, the issue of whether a defendant whose conviction stemmed from a guilty plea is entitled to seek and obtain postconviction DNA testing. As a result, the extent to which a plea of guilty operates as a categorial bar to postconviction DNA testing pursuant to N.C.G.S. § 15A-269 is a question of first impression for this Court.

¶ 27      In seeking to persuade us that defendants who have been convicted on the basis of a guilty plea are ineligible to seek postconviction DNA testing, the State contends that, "[u]nder the plain, unambiguous language of [N.C.G.S. §] 15A-269, a defendant who pled guilty cannot meet the statutory requirements that would entitle him to postconviction DNA testing." In the State's view, the statutory reference to a "verdict" demonstrates the General Assembly's intent that the only persons entitled to seek postconviction DNA testing are those who were convicted as the result of a

jury verdict. According to the State, this relatively strict reading of the relevant statutory language would not exclude those found guilty at a bench trial from obtaining postconviction DNA testing given that N.C.G.S. § 15A-269 had been enacted in 2001, while criminal bench trials had not been authorized until 2013. As further support for this contention, the State directs our attention to several cases in which this Court used the term "verdict" to refer to the decision that the trial judge makes at the conclusion of a bench trial, *see, e.g., State v. Puckett*, 299 N.C. 727, 727 (1980); *State v. Willis*, 285 N.C. 195, 197 (1974); *State v. Brooks*, 287 N.C. 392, 405 (1975), and a decision by the Court of Appeals describing the ruling made by a district court judge at the conclusion of a bench trial as a "verdict," *see State v. Surles*, 55 N.C. App. 179, 182 (1981). As a result, the State contends that "the standard [applicable to requests for postconviction DNA testing] does not apply to defendants who were convicted by means other than a factfinder's decision at a trial."

In addition, the State argues that, even though "[N.C.G.S. §] 15A-269(a)(1) presupposes that the defendant presented a 'defense' in order to evaluate whether the [DNA] evidence is relevant to that defense," "a defense was never presented" "when a defendant enters a plea of guilty." On the contrary, the State argues that, by pleading guilty, "the defendant admitted his guilt" and "waived all defenses" other than a challenge to the sufficiency of the indictment, including "his right to test the evidence before a jury." In other words, the State contends that the fact that the

defendant entered a guilty plea demonstrates that he or she had no "defense" to which postconviction DNA testing could be material, with "[a]ny analysis of whether testing is material to [the d]efendant's 'defense' [in cases involving guilty pleas necessarily] begin[ning] with speculation as to what his defense was."

¶ 29        Aside from these arguments, which rely directly upon specific language that appears in N.C.G.S. § 15A-269, the State advances a number of prudential arguments in opposition to a decision to allow defendants convicted on the basis of guilty pleas to seek and obtain postconviction DNA testing.  For example, the State asserts that allowing such a defendant access to postconviction DNA testing would be inconsistent with the statutory requirement that a defendant seeking such testing "sign[ ] a sworn affidavit of innocence," N.C.G.S. § 15A-269(b)(3), on the theory that, in order "[t]o comply with this requirement, a defendant who pled guilty and swore himself to be 'in fact guilty' of the crime must either:  (1) lie and swear he is innocent even though he knows he is not or (2) admit that his earlier statement of factual guilt was untrue." In addition, the State argues that "[t]here is no precedent binding in North Carolina that applies *Brady* to guilty pleas," a fact that the State believes to be "relevant because [N.C.G.S.] § 15A-269(b)(2) adopts the *Brady* standard" and "[t]he General Assembly is presumed to act 'with full knowledge of prior and existing law and its construction by the courts,' " *State v. Anthony*, 351 N.C. 611, 618 (2000).  Similarly, the State argues that a defendant's decision to enter a guilty plea obviates the

necessity for the State to make a full evidentiary presentation at trial, "mak[ing] it difficult[,] if not impossible[,] for any court to evaluate how potential DNA testing might affect the fact finder's assessment of the evidence." Finally, the State expresses concern about the possibility that defendants might engage in "gamesmanship" by pleading guilty in order to avoid the full development of a trial record before filing a subsequent motion for postconviction DNA testing pursuant to N.C.G.S. § 15A-269.

¶ 30 In seeking to persuade us to uphold the Court of Appeals' decision with respect to this issue, defendant argues, in reliance upon *Randall*, that, when the General Assembly enacted N.C.G.S. § 15A-269, it intended for defendants who were convicted based upon a plea of guilty to be able to seek post-conviction DNA testing. In support of this assertion, defendant directs our attention to the language of the statute, the practical consequences that will result from the differing ways in which the relevant statutory language can be construed, the remedial nature of the statute, the title of the legislation that enacted the statute, and the political and social context in which the statute was enacted. More specifically, defendant asserts that N.C.G.S. § 15A-269 was enacted during a period in which many individuals convicted of serious crimes were being exonerated through the use of modern DNA testing procedures, with the relevant statutory provisions having arisen from "concerns that there are people who have been convicted of serious crimes who are innocent." In light of the remedial nature of N.C.G.S. § 15A-269, defendant contends that its language "must

not be given an interpretation that will result in injustice if it 'may reasonably be otherwise consistently construed with the intent of the act,' " *Nationwide Mut. Ins. Co.*, 293 N.C. 431, 440 (1977). According to defendant, interpreting N.C.G.S. § 15A-269 to exclude defendants whose convictions were based upon guilty pleas would result in significant injustice given that many defendants plead guilty in spite of the fact that they are factually innocent.

¶ 31 In defendant's view, nothing in the language of N.C.G.S. § 15A-269 expressly excludes defendants who plead guilty from seeking postconviction DNA testing, with the manner in which Judge Berger parsed the relevant statutory language having involved a failure to give appropriate regard to the "eminently reasonable" reading of the statute that the Court of Appeals adopted in *Randall* and having overlooked the fact that, even though "the [General Assembly] has amended N.C.G.S. § 15A-269 several times since its enactment," it "has chosen not to amend the statute in reaction to *Randall*." Furthermore, defendant contends that a strict reading of the term "verdict" would lead to the absurd result that any defendant convicted by a jury, but not a defendant convicted at a bench trial or a defendant who enters a plea of guilty in reliance upon the decision of the Supreme Court of the United States in *North Carolina v. Alford*, 400 U.S. 25 (1970), could successfully seek and obtain postconviction DNA testing by making the required statutory showing.

¶ 32        Defendant points out that his sentencing hearing took place prior to the recent

enactment of criminal justice reform legislation and at a time when defendants had

limited access to pre-trial discovery and when prosecutors were required to try a first-

degree murder case capitally if the record contained evidence tending to show that at

least one aggravating circumstance existed.  In addition, defendant notes that, at the

time that he entered his guilty plea, there was strong public support for the death

penalty and a significant number of death sentences were being imposed.  *See*

Barbara O'Brien & Catherine M. Grosso, *Confronting Race: How a Confluence of

Social Movements Convinced North Carolina to Go Where the* McCleskey *Court

Wouldn't*, 2011 Mich. St. L. Rev. 463, 488 (2011); Cynthia F. Adcock, *The Twenty-

Fifth Anniversary of Post-*Furman *Executions in North Carolina: A History of One

Southern State's Evolving Standards of Decency*, 1 Elon L. Rev. 113, 131, 131 n. 96

(2009) (citations omitted).  According to defendant, it was "against this backdrop that

defendants charged with first-degree murder in the early 1990's who were actually

innocent had to decide whether to plead guilty rather than roll the dice with a jury

and the appellate courts."

¶ 33        Finally, defendant notes that he was not provided with either of Ms. Lashley's

statements and that he did not know the identity of the State's eyewitness or the

nature of her testimony prior to the sentencing hearing, so that he was left without

"crucial information about the weakness of the State's evidence" at the time that he

entered his guilty plea even though, in light of the fact that the State had evidence tending to show the existence of at least two possible statutory aggravating circumstances,[2] his case had to be tried capitally. Defendant asserts that, despite the fact that he had "strongly and repeatedly proclaimed his innocence from the time of his arrest through the time of his plea," "the lack of almost any knowledge of the evidence against him, combined with the fact that he was facing the death penalty in a very death-prone state, could cause even the most resolute of defendants to crack under the pressure." As a result, for all of these reasons, defendant contends that defendants who enter guilty pleas should not be precluded from seeking and obtaining postconviction DNA testing pursuant to N.C.G.S. § 15A-269.

¶ 34        "The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209 (1990). Although the first step in determining legislative intent involves an examination of the "plain words of the statute," *Elec. Supply Co. of Durham v. Swain Elec. Co.*, 328 N.C. 651, 656 (1991), "[l]egislative intent can be ascertained not only from the phraseology of the statute

---

[2] The aggravating circumstances that the State might have had sufficient evidence to attempt to establish included that Mr. Boyd was killed during the commission of an armed robbery, *see* N.C.G.S. § 15A-2000(e)(5) (1992), and that the killing of Mr. Boyd "was committed for pecuniary gain," *see* N.C.G.S. § 15A-2000(e)(6) (1992). However, in accordance with this Court's decision in *State v. Quesinberry*, 319, N.C. 228, 238 (1987), the jury would have only been entitled to consider one of these two factors had it been called upon to determine whether defendant should have been sentenced to death.

but also from the nature and purpose of the act and the consequences which would follow its construction one way or the other," *Sutton v. Aetna Cas. & Sur. Co.*, 325 N.C. 259, 265 (1989) (citations omitted). As this Court has clearly stated, remedial statutes such as N.C.G.S. § 15A-269 "should be construed liberally, in a manner which assures fulfillment of the beneficial goals, for which [they were] enacted and which brings within [them] all cases fairly falling within its intended scope." *Burgess v. Joseph Schlitz Brewing Co.*, 298 N.C. 520, 524 (1979).

¶ 35     As defendant points out, nothing in the text of N.C.G.S. § 15A-269 expressly precludes defendants who have pleaded guilty from seeking postconviction DNA testing.[3] In addition, the relevant statutory language is not devoid of ambiguity. *See*

---

[3] The General Assembly does, of course, understand how to limit the rights of convicted criminal defendants who have entered pleas of guilty to seek relief from their convictions and related sentences on direct appeal. For example, N.C.G.S. § 15A-1444 limits the ability of a convicted criminal defendant who entered a plea of guilty to seek appellate review of his or her conviction as a matter of right by providing that such a defendant may only contend on direct appeal that the evidence admitted at the sentencing hearing did not support the sentence imposed by the trial court or in the event that the trial court sentenced the defendant to a term of imprisonment that falls outside the presumptive range for a defendant convicted of committing an offense of the same class with the same prior record level, N.C.G.S. § 15A-1444(a1) (2021), and on the grounds that the trial court erred in ascertaining the defendant's prior record level or the trial court's judgment contained an unauthorized disposition or term of imprisonment. N.C.G.S. § 15A-1444(a2). Similarly, a defendant whose conviction rests upon a guilty or no contest plea may appeal the trial court's decision to deny his motion to withdraw his plea of guilty or no contest. N.C.G.S. § 15A-1444(e). Finally, a defendant convicted on the basis of a plea of guilty is entitled to appellate review of the trial court's decision to deny his or her motion to suppress unlawfully obtained evidence under certain circumstances. N.C.G.S. § 15A-979(b) (2021); *see also State v. Reynolds,* 298 N.C. 380, 397 (1979). Aside from these instances, however, a defendant convicted on the basis of a plea of guilty is only entitled to direct review in the appellate division by seeking the issuance of a writ of certiorari. N.C.G.S. § 15A-1444(a1).

*Winkler v. N.C. State Bd. of Plumbing*, 374 N.C. 726, 730 (2020) (describing an ambiguous statute as one that is "equally susceptible of multiple interpretations"). Although the presence of the term "verdict" in the relevant statutory language may suggest that the General Assembly did, in fact, primarily have jury trials in mind at the time that it drafted N.C.G.S. § 15A-269, we are unable to understand the term "verdict" to operate as a limitation upon the reach of postconviction DNA testing given the manner in which the statute, considered as a whole, is written and the circumstances that led to its enactment. *See State v. Winslow*, 274 Neb. 427, 434, 740 N.W.2d 794, 799 (2007) (concluding that, despite the reference to a "trial" in Nebraska's postconviction DNA testing statute, that statute, when considered "as a whole," indicates that the Nebraska legislature did not intend to limit the availability of postconviction DNA testing to persons who had been convicted at the conclusion of a contested trial on the issue of guilt or innocence). While the decision of a jury may be the quintessential example of what constitutes a "verdict," the fact that a "verdict" can consist of "an opinion or judgment," *New Oxford American Dictionary* 1921 (3d ed. 2010), or "[a]n expressed conclusion; a judgment or opinion," *American Heritage Dictionary* (5th ed. 2012), and the State's concession that the term "verdict" as used in N.C.G.S. § 15A-269(b)(2) can encompass more than "a jury's or decision on the factual issues of a case," *Verdict, Black's Law Dictionary* (11th ed. 2019), suggests that the term "verdict" can be understood in a broader sense as well. *See also id.*

(recognizing that "verdict" can also be defined "loosely, in a nonjury trial, [as] a judge's resolution of the issues of a case" and that today the term "typically survives in contexts not involving a jury"). We have previously recognized that "[c]ourts may and often do consult dictionaries" to determine the ordinary meaning of words used in statutes and that such words "are construed in accordance with their ordinary meaning *unless some different meaning is definitively indicated by the context.*" *State v. Ludlum*, 303 N.C. 666, 671 (1981) (emphasis added). As a result, the mere fact that the relevant statutory language speaks in terms of a "verdict" does not, without more, necessarily suggest that postconviction DNA testing is only available to situations in which the defendant's conviction stems from a decision on the merits of the issue of guilt or innocence by a trier of fact.

¶ 36    Similarly, we are not persuaded that the term "defense" as used in N.C.G.S. § 15A-269(a)(1) should be limited to the specific arguments that the defendant advanced before the trial court prior to his or her conviction. In ordinary parlance, a "defense" is nothing more than an "attempted justification or vindication of something." *New Oxford American Dictionary* 454 (3d ed. 2010). Although a "defense" can be understood as "[a] defendant's stated reason why the plaintiff or prosecutor has no valid case," it can also be understood as "[a] defendant's *method and strategy* in opposing the plaintiff or the prosecution," *Defense, Black's Law Dictionary* (11th ed. 2019) (emphasis added), with other sources having broadly defined the term as

"any matter that the defendant will in practice raise," Glanville Williams, *Textbook of Criminal Law* 114 n.3 (1978); "[a] fact or law that provides a full or partial exoneration of the defendant against the charges or claims made in a lawsuit or prosecution," *American Heritage Dictionary* (5th ed. 2012); and "the method and collected facts adopted by a defendant to protect himself against a plaintiff's action," *Webster's Third Int'l Dictionary* (1961). Thus, the statutory reference to a "defense" is sufficiently broad to include any argument that might have been available to a defendant to preclude a conviction or establish guilt for a lesser offense.

¶ 37   The practicalities of the manner in which the criminal process functions provide additional grounds for believing that "defense" as used in N.C.G.S. § 15A-269 should be read broadly. Aside from the fact that a defendant may contemplate relying upon many possible defenses before settling upon one or more of them for use before the trial court, a defendant may ultimately decide to refrain from presenting any "defense" at all and to enter a plea of guilty for a number of reasons that do not hinge upon his or her actual guilt or innocence, including a concern that the risk of a conviction is so great that a guilty plea represents the best way to avoid the imposition of a more severe sentence. *See State v. Harbison*, 315 N.C. 175, 180 (1985) (recognizing that there are "situations where the evidence is so overwhelming that a plea of guilty is the best trial strategy"). As a result, the mere fact that a particular defendant elects to enter a guilty plea does not mean that he or she had no defense

and would not have been willing to assert it had additional evidence been available. *Cf. State v. Hewson*, 220 N.C. App. 117, 124 (2012) (assessing whether the requested DNA evidence would be material to a heat of passion defense, even though that defense had not been raised at trial).

¶ 38     A broader reading of the reference to a "defense" in N.C.G.S. § 15A-269(a)(1) than that contended for by the State is also supported by other portions of the relevant statutory language, which requires a litigant seek such testing to show that postconviction DNA testing "[i]s material to the defendant's defense" rather than to the defense that the defendant actually presented at trial. N.C.G.S. § 15A-269(a)(1). Put another way, the fact that N.C.G.S. § 269(a)(1) is couched in the present tense suggests a recognition on the part of the General Assembly that a defendant's "defense" may evolve in light of newly available DNA evidence. As a result, the statutory reference to the defendant's "defense" does not, without more, satisfy us that the General Assembly intended to limit the availability of postconviction DNA testing to defendants who were convicted at the conclusion of a contested trial on the issue of guilt or innocence.

¶ 39     The General Assembly enacted N.C.G.S. § 15A-269 by means of a piece of legislation entitled "An Act to Assist an Innocent Person Charged With or Wrongly Convicted of a Criminal Offense in Establishing the Person's Innocence." S.L. 2001-282, § 4, 2001 N.C. Sess. Laws 833, 837. As we have previously held, "even when the

language of a statute is plain, 'the title of an act should be considered in ascertaining the intent of the legislature.' " *Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 8 (2012) (quoting *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 812 (1999)). "[T]he title is part of the bill when introduced, being placed there by its author, and probably attracts more attention than any other part of the proposed law; and if it passes into law, the title thereof is consequently a legislative declaration of the tenor and object of the act." *State v. Keller*, 214 N.C. 447, 447 (1938). As the title to the relevant legislation makes clear, the General Assembly enacted N.C.G.S. § 15A-269 for the purpose of allowing wrongly convicted persons to assert and establish their innocence.

¶ 40    As of the date upon which the General Assembly enacted N.C.G.S. § 15A-269, a number of defendants who had been convicted of committing serious crimes had been exonerated as a result of DNA testing, a technology that had only become widely available in the relatively recent past. According to the National Registry of Exonerations, 102 people across the United States had been exonerated as a result of DNA testing from 1989 to 2001, with three of these cases having involved North Carolina defendants,[4] one of whom had served four years in prison after having

---

[4]    National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx. The registry is a project of the Newkirk Center for Science & Society at the University of California-Irvine, the University of Michigan Law School, and the Michigan State University College of Law.

entering a plea of guilty to committing a sexual assault before DNA testing demonstrated that he did not commit that crime.[5]

¶ 41      Any argument that innocent people do not enter guilty pleas and that the General Assembly could not have intended to create a situation in which defendants were allowed to make conflicting sworn statements concerning their guilt or innocence fails for a number of reasons as well. Aside from the fact that at least one North Carolina defendant who had been convicted based upon his plea of guilty had been exonerated through the use of DNA testing even before enactment of N.C.G.S. § 15A-269, of the 2,997 documented cases since 1989 in which individuals who have been exonerated after having been wrongfully convicted, 672—or over 22 percent—involved guilty pleas,[6] with this number including thirteen cases arising in North Carolina, eight of whom were exonerated on the basis of DNA testing.[7] For that reason, the available evidence clearly suggests that innocent people do, in fact, enter guilty pleas.

---

[5] Profile of Keith Brown, National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3062 (last visited Mar. 2, 2022).

[6] National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (apply filter for "Guilty Plea") (last visited March 2, 2022).

[7] National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx. (apply filters for "North Carolina" and "Guilty Plea") (last visited March 2, 2022).

An innocent person may plead guilty to the commission of a criminal offense for a number of perfectly understandable reasons. For example, an innocent defendant may elect to plead guilty to avoid the risks and uncertainties associated with a trial that may result in a more severe sentence than the one offered by the prosecutor pursuant to a plea agreement. *See* Corinna B. Lain, *Accuracy Where it Matters: Brady v. Maryland in the Plea Bargaining Context*, 80 Wash. U. L. Q. 1, 29 (2002) (observing that an innocent defendant may choose to "cut [his or her] losses" and plead guilty when he or she is "faced with an intolerably high estimate of the chance of conviction at trial"). As evidence of that fact, we note that a 2002 report by the North Carolina Sentencing and Policy Advisory Commission, a body that provides recommendations to the General Assembly regarding sentencing legislation, found that defendants who enter guilty pleas "may get a shorter active sentence or avoid active time altogether by getting probation." N.C. Sent'g & Pol'y Advisory Comm'n, *Sentencing Practices Under North Carolina's Structured Sentencing Laws* 24 (2002) [hereinafter *Sentencing Practices*].[8] In addition, entering a guilty plea provides the defendant with "more control over the sentence" and facilitates an outcome that "is more predictable than what a judge and jury may decide to do." *Id.* Finally, defendants often plead guilty "out of pure fear" that they will be treated more harshly

---

[8] Available at https://www.nccourts.gov/assets/documents/publications/disparityreportforwebR_060209.pdf?1iTr9wYxjAeDSGBuk5MdRLfgFq0ELkz.

if they insist upon pleading not guilty and going to trial, Daina Borteck, Note, *Pleas for DNA Testing: Why Lawmakers Should Amend State Post-Conviction DNA Testing Statutes to Apply to Prisoners Who Pled Guilty*, 25 Cardozo L. Rev. 1429, 1440 (2004), as is evidenced by the Sentencing and Policy Advisory Commission's conclusion that "prosecutors are more likely to seek an aggravated sentence or to ask for consecutive sentences in cases that proceed through trial," *Sentencing Practices* at 24, despite the fact that a defendant has a constitutional right not to be penalized for exercising the right to plead not guilty and be tried by a jury of his or her peers, *State v. Maske*, 358 N.C 40, 61 (2004).

An innocent defendant may be particularly prone to enter a guilty plea in a potentially capital case like this one. As the Innocence Network points out in its amicus brief, an innocent defendant may be confronted with the difficult choice of "falsely plead[ing] guilty and serv[ing] time in prison, or risk[ing] execution," with "many understandably choos[ing] the guilty plea" when "[f]aced with that dilemma." Similarly, Judge Jed S. Rakoff of the United States District Court for the Southern District of New York has noted that the "plea bargain[ing] system, by creating such inordinate pressures to enter into plea bargains, appears to have led a significant number of defendants to plead guilty to crimes they never actually committed," with defendants charged with rape and murder having presumably done "so because, even though they were innocent, they faced the likelihood of being convicted of capital

offenses and sought to avoid the death penalty, even at the price of life imprisonment." Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. of Books (Nov. 20, 2014).[9] As a result, an innocent defendant may well choose the relative certainty of the more lenient sentence associated with the entry of a guilty plea to the risk of receiving a more severe one following a guilty verdict rendered at trial. Any decision to limit the scope of the relief that the General Assembly intended to make available by means of the enactment of N.C.G.S. § 15A-269 to those whose convictions resulted from decisions made at the conclusion of trials on the merits overlooks the extent to which innocent people can be wrongfully convicted after pleading guilty, with there being no reason that we can identify for the General Assembly to have decided that wrongfully convicted individuals who pled guilty should be treated differently than wrongfully convicted individuals who were incarcerated as the result of decisions made by juries or trial judges sitting without a jury.

¶ 44    Finally, a criminal defendant is not required to admit guilt as a precondition for entering a valid plea of guilty. Aside from the fact that nothing in N.C.G.S. § 15A-1022 requires the defendant to make such an admission, the Supreme Court of the United States clearly held in *Alford* that "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison

---

[9] Available at https://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/?lp_txn_id=1298990.

sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." 400 U.S. at 37. As a result, we do not believe that precluding a convicted criminal defendant from seeking postconviction DNA testing pursuant to N.C.G.S. § 15A-269 serves any interest that the State might have in upholding that truthfulness of information submitted for a court's consideration, and that the concern that a defendant may execute an affidavit of innocence that conflicts with an earlier admission of guilt is insufficient, in our view, to justify a refusal to deprive a person who claims to have been wrongfully convicted of the right to seek and obtain postconviction DNA testing pursuant to N.C.G.S. § 15A-269.

¶ 45      The other prudential arguments that the State has advanced in support of a construction that denies the relief otherwise available pursuant to N.C.G.S. § 15A-269 to convicted defendants who enter guilty pleas do not strike us as persuasive either. As should be obvious, the most likely relief that a defendant who successfully obtains postconviction DNA testing that produces an exculpatory result can obtain will be the granting of a new trial. *See* N.C.G.S. § 15A-270(c) (2021). Although the ways of convicted criminal defendants are sometimes difficult to fathom, we find it hard to believe that such a person would enter a plea of guilty in order to improve his odds of procuring a new trial through the use of postconviction DNA testing given that he or she could have had a trial without subjecting himself or herself to the imposition of criminal sanction. For that reason, we do not find the State's expression

of concern about "gamesmanship" on the part of criminal defendants who elect to enter pleas of guilty to be particularly compelling.

¶ 46  The same is true of the State's contention that the General Assembly could not have intended for postconviction DNA testing to be made available to defendants who entered guilty pleas in light of the State's interest in the finality of criminal judgments and the fact that this Court has never held that *Brady* relief was available to defendants whose convictions rested upon pleas of guilty.[10]  As an initial matter, we note that the State's interest in the finality of criminal judgments is not absolute; indeed, the existence of statutory provisions relating to motions for appropriate relief and postconviction DNA testing demonstrates the General Assembly's recognition that, on occasion, the State's interest in finality should give way to other considerations.  Moreover, the General Assembly has required a defendant to make a materiality showing as a precondition for obtaining postconviction DNA testing in recognition of the importance of the finality interest upon which the State relies. *Lane,* 370 N.C. at 524 (stating that allowing DNA testing in the absence of a

---

[10] Although the Supreme Court of the United States has not addressed the extent to which *Brady* claims can be asserted by defendants convicted on the basis of a guilty plea, at least three federal circuit courts have expressly allowed the assertion of such claims, *Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir. 1995); *Miller v. Angliker*, 848 F.2d 1312, 1322 (2d Cir. 1988); *White v. United States*, 858 F.2d 416, 424 (8th Cir. 1988), with one circuit having reached the opposite conclusion, *United States v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009), and with other circuits having expressed uncertainty about the extent to which such claims are available without having explicitly prohibited them, *see United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010); *United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010).

materiality requirement "would set a precedent for allowing criminal defendants to ceaselessly attack the finality of criminal convictions without significantly assisting in the search for truth"). In addition, it seems to us that, subject to any constitutional limitations that may otherwise exist, the General Assembly is free to adopt whatever standard for making postconviction DNA testing available to convicted criminal defendants that it thinks best and elected, in the exercise of its legislative authority, to use a *Brady*-based standard for that purpose in N.C.G.S. § 15A-269. *See Lane*, 370 N.C. at 519. Finally, the Supreme Court of the United States and other courts have successfully analyzed both materiality and the related concept of prejudice in the postconviction context in cases arising from guilty pleas. *See Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985) (holding that, in order to make the showing of prejudice necessary to support an ineffective assistance of counsel claim in a guilty plea context, the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial"); *see also Buffey v. Ballard*, 236 W. Va. 509, 515–16, 782 S.E.2d 204, 210–11 (2015) (holding that the State's failure to disclose certain DNA evidence violated the defendant's due process rights on the grounds that, if the evidence in question had been disclosed to the defendant, he would not have entered a guilty plea or been advised to do so by his attorney and would have been able to raise a reasonable doubt about his guilt at trial); *Miller*, 848 F.2d at 1322 (concluding that, "if there is a

reasonable probability that but for the withholding of the information the accused would not have entered the recommended plea but would have insisted on going to a full trial, the withheld information is material" for purposes of *Brady*); *Sanchez*, 50 F.3d at 1454 (holding that "the issue in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant would have refused to plead and would have gone to trial"). As a result, aside from the fact that the General Assembly appears to have had an absolute right to adopt a *Brady*-based standard for use in determining whether a defendant who had been convicted as the result of a guilty plea was entitled to postconviction DNA testing, there is ample basis for concluding that such a standard can readily be applied in the guilty plea context and is frequently used in addressing the validity of similar claims.[11]

¶ 47      Finally, the State's expressions of concern about the difficulty of defeating a defendant's effort to make the required showing of materiality arising from the fact

---

[11] The State's argument in reliance upon *Brady* appears to rest upon the assumption that, by holding that the use of a *Brady*-based materiality standard was inherent in N.C.G.S. § 15A-269, we incorporated the entirety of the Supreme Court's *Brady*-related jurisprudence in North Carolina's postconviction DNA testing statute. Any such assumption misreads our decision in *Lane*, which did nothing more than utilize a materiality standard deemed appropriate for use in evaluating claims arising from the State's failure to disclose exculpatory evidence to determine whether the defendant had made a sufficient showing to justify the entry of an order requiring postconviction DNA testing. As a result, the extent to which a convicted criminal defendant would have the ability to seek relief on the basis of *Brady* has no relevance to the proper resolution of the issue of whether a defendant who entered a guilty plea is entitled, in appropriate instances, to obtain postconviction DNA testing pursuant to N.C.G.S. § 15A-269.

that the factual basis presentation that is necessary to support the acceptance of a guilty plea is less extensive than that needed to support a conviction at a contested trial on the merits and the risk that allowing defendants who entered guilty pleas to seek postconviction DNA testing will result in a flood of frivolous applications for such testing strike us as overstated. Although we acknowledge that our decision may well result in the filing of additional applications for postconviction DNA testing, the ability of the trial courts to summarily deny such applications in the event that the defendant fails to make an adequate initial showing of materiality should limit the resulting imposition upon the trial judiciary. In addition, we see no reason why the State should be precluded from submitting additional information bearing upon the issue of materiality in the event that the information contained in the existing record is not sufficient to permit the trial court to make an appropriate materiality determination.

¶ 48      As this Court has previously recognized, "[p]erhaps no interpretive fault is more common [in statutory construction cases] than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." *N.C. Dep't of Transp. v. Mission Battleground Park*, 370 N.C. 477, 483 (2018) (quoting Antonin Scalia & Bryan A. Gardner, *Reading Law: The Interpretation of Legal Texts* 167 (2012)). After conducting such a review, we hold that, when read in context and in

light of its underlying purposes, N.C.G.S. § 15A-269 makes postconviction DNA testing available to individuals whose convictions rest upon guilty pleas in the event that those persons are otherwise able to satisfy the relevant statutory requirements. Any other construction of the relevant statutory language would thwart the General Assembly's apparent intent to ensure that individuals who claim to have been wrongfully convicted and are able to make a credible showing of innocence have the opportunity to take advantage of a technology that has the potential to both definitively acquit the innocent and convict the guilty. As a result, for all of these reasons, we hold that the Court of Appeals did not err in determining that a defendant who pleads guilty is not disqualified from seeking postconviction DNA testing pursuant to N.C.G.S. § 15A-269.

**C. Materiality of DNA Evidence to Defendant's Defense**

¶ 49     The final issue that must be addressed in evaluating the validity of defendant's challenge to the Court of Appeals' decision to uphold the denial of defendant's request for postconviction DNA testing is whether defendant made a sufficient showing of materiality, which requires defendant to demonstrate that, if the relevant evidence had been admitted at trial, "there exists a reasonable probability that the verdict would have been more favorable to the defendant." N.C.G.S. § 15A-269(a)–(b); *Lane*, 370 N.C. at 519; *see also State v. Byers*, 375 N.C. 386, 394 (2020) (construing "reasonable probability" to mean "a probability sufficient to undermine confidence in

the outcome" (quoting *State v. Allen*, 360 N.C. 297, 316 (2006)). The required "materiality" determination should be made based upon a consideration of the entire record and focus "upon whether the evidence would have affected the jury's deliberations," *Lane*, 370 N.C. at 519, with the applicable standard in guilty plea cases being whether "there is a reasonable probability that DNA testing would have produced a different outcome; for example, that [the] [d]efendant would not have pleaded guilty *and otherwise would not have been found guilty*," *Randall*, 259 N.C. App. at 887 (emphasis in original).

¶ 50    In seeking relief from the Court of Appeals' decision with respect to the materiality issue, defendant begins by arguing that the Court of Appeals erred by requiring him to "show that the requested testing necessarily would exclude his involvement in the crime." In addition, defendant contends that the Court of Appeals "failed to conduct its materiality analysis in the context of the entire record" by neglecting to consider "highly relevant facts concerning [defendant's] decision to plead guilty and the nature of the State's evidence," including the fact that defendant had "repeatedly proclaimed his innocence, went to trial, was very reluctant to plead guilty, and had a strong alibi." In light of the fact that he had an alibi and the fact that the State's case rested upon the testimony of a "single highly impeachable purported eyewitness," defendant asserts that it was reasonably probable that he

would have been acquitted in the event that he was able to show the presence of third-party DNA on the shell casings and projectile found at the Amoco station.

¶ 51 According to defendant, the "reasonable probability" test applicable in postconviction DNA testing proceedings should be distinguished from both a "preponderance-of-the-evidence" test and a "sufficiency-of-the-evidence" test, with the Court of Appeals having erred by requiring him to show that "the presence of another's DNA or fingerprints on . . . [the] evidence would . . . necessarily exclude [his] involvement in the crime," *Alexander*, 271 N.C. App. at 82, given that this legal standard is "plainly inconsistent with the *Brady* standard of materiality this Court adopted in *Lane*." In addition, defendant contends that the Court of Appeals decided the "materiality" issue based upon what it believed to be "substantial evidence of [d]efendant's guilt," which consisted of (1) Ms. Lashley's eyewitness testimony; (2) defendant's admission to having been at the Amoco station during the investigation into the robbery and murder; and (3) the admission of guilt inherent in defendant's decision to plead guilty, *see Alexander*, 271 N.C. App. at 81–82, and argues that the Court of Appeals should have also considered (1) his continued protestations of innocence and his reluctance to plead guilty; (2) the fact that neither defendant nor his attorneys knew Ms. Lashley's identity before the entry of defendant's guilty plea; (3) his alibi evidence; (4) his claim that he had not been permitted to enter an *Alford* plea; and (5) his claim that his trial counsel had pressured him to plead guilty and

had told him that he would be released after serving ten years in the event that he pleaded guilty. As a result, defendant argues that, had the Court of Appeals conducted a proper materiality analysis, it would have determined that it was reasonably probable that he would not have entered a guilty plea in the event that he had been able to prove that third-party DNA had been detected on the shell casings and the projectile recovered from the Amoco station and that his own had DNA had not been present on that evidence.

¶ 52      Similarly, defendant contends that, had he elected to plead not guilty and gone to trial, there is a reasonable probability that he would not have been convicted of second-degree murder. In defendant's view, the Court of Appeals erred by assuming that two people were involved in the robbery and murder of Mr. Boyd based upon Ms. Lashley's "highly suspect" testimony, having devoted a substantial portion of his brief to an attack upon Ms. Lashley's credibility that focused upon the conflicting accounts that Ms. Lashley gave of her activities on the day of the robbery and murder, her claims to have known defendant and his family for a lengthy period of time, and her failure to select defendant's image from the photographic array that was shown to her. As a result, defendant contends that "it is reasonably probable [that] the jury would have found that she did not witness anything at all; that she was only at the Amoco [station] after the fact; and that there was only one person involved in the crime," with evidence concerning the absence of defendant's DNA from the shell

casings and projectile having a tendency to further undermine Ms. Lashley's credibility and corroborate his contention that Ms. Lashley did not actually see him leaving the Amoco station in the aftermath of the robbery and murder.

¶ 53        Aside from his reliance upon what he contends is the suspect quality of Ms. Lashley's testimony, defendant points to (1) the lack of forensic evidence linking him to the crime, (2) the existence of witnesses who could testify that he had been at home at the time of the murder, (3) the fact that another robbery during which a similar weapon was used had been committed in the vicinity of the Amoco station earlier that day, and (4) Mr. Terry's alleged admission to having robbed and killed Mr. Boyd.  In addition, defendant argues that his presence at the Amoco station in the aftermath of the robbery and murder had no significance given that "Norlina is a small town where a murder would [have been] a rare event" and that "there were many other people that had gathered at the crime scene besides [defendant]."  As a result, defendant claims that "[t]here is more than a reasonable probability . . . that a jury would not have convicted [defendant] of [the] robbery and murder of [Mr.] Boyd" had third-party DNA been found on the shell casings and projectile and his own DNA not been detected.

¶ 54        In seeking to persuade us to uphold the Court of Appeals' decision with respect to the materiality issue, the State begins by arguing that, "[w]hile the [Court of Appeals] did say that the requested testing would not exclude [d]efendant from

having been involved in the crime, it never said exclusion was the standard for showing materiality" and that the Court of Appeals had, instead, utilized the materiality standard articulated in *Lane*. According to the State, "[d]efendant himself [ ] introduced the idea that DNA testing would exclude him as the perpetrator when he stated in his motion that testing showing [Mr.] Terry's DNA would 'exculpate' him."

¶ 55    Secondly, the State contends that, even though "materiality is analyzed in the context of the entire record, the record is limited to only the evidence available at the time of the first trial." For that reason, the State contends that the only evidence that this Court can consider in addressing the materiality issue is the testimony of the witnesses who took the stand at the sentencing hearing, with the only sentencing hearing evidence that had any bearing upon the issue of defendant's guilt or innocence being the testimony of Ms. Lashley. In the State's view, defendant is not entitled to rely upon any of the reports generated by investigating officers and forensic experts prior to the entry of defendant's guilty plea on the grounds that "[n]o party authenticated, offered, or moved to admit these items into evidence at any proceeding" and that, even though "the reports very well may be authentic," this Court cannot speculate concerning the manner in which or extent to which any party might have used those reports at trial. In the same vein, the State contends that the Court cannot consider testimony from Mr. Alexander, defendant's father, or Ms.

Brown, the daughter of Mr. Alexander's girlfriend, concerning defendant's location at the time of the robbery and murder given that they did not testify at defendant's sentencing hearing and that the Court should disregard Mr. White's testimony concerning Mr. Terry's alleged involvement in the robbery and murder given that Mr. White provided this information years after defendant entered his guilty plea.

Finally, the State argues that defendant cannot show that the requested DNA evidence is material given that "the State's eyewitness testimony identifying [d]efendant as one of the two robber-murders was overwhelming and favorable DNA test results would not contradict that evidence." According to the State, "the presence of DNA from someone other than [d]efendant on a shell casing or projectile does not call into question [d]efendant's guilt" because "[s]uch results would show at best that someone other than [d]efendant touched the shell casings or projectile at some time for some reason that need not have been related to the robbery-murder." In addition, the State notes that Ms. Lashley had stated in all three of the accounts that she gave of her actions on the day of the robbery and murder that, after hearing gunshots, she had seen defendant and an unknown man leaving the Amoco station and that defendant had returned to the Amoco station later that day. The State describes Ms. Lashley's account of the relevant events as "internally consistent and . . . based on personal experiences that made her testimony believable," as even defendant's trial counsel had acknowledged. As a result, the State urges us to uphold the Court of

Appeals' determination that defendant had failed to make the necessary showing of materiality.

¶ 57     A careful review of the Court of Appeals' opinion satisfies us that it did not misstate or misapply the applicable legal standard. After reciting the "reasonable probability" standard and noting that the burden of making the necessary showing of materiality rested upon defendant, the Court of Appeals stated that defendant had

> failed to show how it is reasonably probable that he would not [have] been convicted of at least second-degree murder based on the results of the DNA and fingerprint testing. That is, the presence of another's DNA or fingerprints on this or other evidence would not necessarily exclude [d]efendant's involvement in the crime. The presence of another's DNA or fingerprints could be explained by the possibility that someone else handled the casings/projectile prior to the crime or that the DNA or fingerprints are from [d]efendant's accomplice, as there were two involved in the murder.

*Alexander*, 271 N.C. at 81–82. As we read the quoted language, the Court of Appeals simply stated that defendant had to provide sufficient evidence that he was not involved in the commission of a second-degree murder in order to show materiality and that a showing of the presence of a third party's DNA on the shell casings and projectile did not, without more, tend to show that defendant had no involvement in

the killing of Mr. Boyd.[12]   Nothing in the Court of Appeals' opinion in any way suggests that a defendant seeking to obtain postconviction DNA testing is required to prove that, in the event of favorable test results, the State's evidence would have been insufficient to support a conviction or that the defendant would have definitely been acquitted.   Instead, as the Court of Appeals noted, the inquiry that a court confronted with a request for postconviction DNA testing is required to conduct must focus upon whether it is "reasonably probable" that the outcome at trial would have been different.  *See Bagley*, 473 U.S. at 682.  As a result, we see nothing exceptional in the understanding of the applicable legal standard upon which the Court of Appeals relied in this case.

¶ 58          In addition, defendant has not satisfied us that the Court of Appeals failed to make its materiality decision "in the context of the entire record." *Lane*, 370 N.C. at 519 (quoting *State v. Howard*, 334 N.C. 602, 605 (1993)).   The mere fact that the Court of Appeals did not address each and every piece of evidence presented by defendant does not mean that it failed to consider the entire record.  Instead, as the Court of Appeals recognized, the fundamental problem with defendant's materiality argument is that it overlooks certain weaknesses in the evidence upon which he relies

---

[12] In the interest of clarity, we note that our references to the presence of third-party DNA on the shell casings and projectile recovered from the Amoco station assume that defendant's DNA is not detected on those items either.

and fails to recognize that the evidence that he hopes to obtain from the performance of DNA testing upon the shell casings and projectile has very little bearing upon the issue of his own involvement in the robbery of the Amoco station and the killing of Mr. Boyd. Aside from the fact that the State did not need to show that defendant handled the weapon from which the fatal rounds were fired in order to establish his guilt, proof of the presence of third-party DNA on the shell casings and projectile would do nothing more than establish that, at some unspecified point in time, someone other than defendant touched these items, an event that could have happened before defendant or his accomplice obtained possession of the weapon or in the aftermath of the killing of Mr. Boyd at or before the time that the items were taken into the possession of the investigating officers.[13] As a result, since none of these explanations for the presence of third-party DNA on the shell casings and projectile would be in any way inconsistent with Ms. Lashley's contention that she saw two men, one of whom was defendant, leaving the Amoco station in the aftermath of the robbery and murder and since defendant would have been guilty of the murder of Mr. Boyd on an acting in concert theory in the event that he had been present for and participated in the commission of those crimes even if he had never personally held the weapon from which the fatal shots were fired, *see State v. Barnes*, 345 N.C.

---

[13] In view of the fact that the weapon from which the fatal shots were fired was never recovered, there is no way for postconviction DNA testing to shed any direct light upon the identity of the person who actually killed Mr. Boyd.

184, 233 (1997) (holding that, in the event that "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose" (quoting *State v. Erlewine*, 328 N.C. 626, 637 (1991)), we are unable to determine that the performance of DNA testing on the shell casings and projectile recovered from the Amoco station would provide material evidence of defendant's innocence of second-degree murder.

¶ 59    In addition, we note that Judge Jenkins had the opportunity to hear Ms. Lashley's testimony during the sentencing hearing and stated that he found her "to be fair in her testimony" and that her testimony was "reasonable and consistent with other believable evidence in the case." Judge Jenkins' assessment of Ms. Lashley's credibility is reinforced by the actions of defendant's trial counsel, who made no effort to obtain authorization to seek the withdrawal of defendant's guilty plea after hearing Ms. Lashley testify on direct and cross-examination. *See State v. Handy*, 326 N.C. 532, 539 (1990) (listing "the strength of the State's proffer of evidence" as one of the factors that should be considered in deciding whether to allow a defendant to withdraw a guilty plea). Finally, we note that, despite the inconsistencies in the accounts that she gave of her activities on the morning of the robbery and murder, Ms. Lashley consistently asserted that she had visited the Amoco station on the

morning in question, that she had heard a commotion inside the store, and that she had seen two men, one of whom was defendant, leave the service station. As a result, given the contemporaneous assessments of Ms. Lashley's testimony as credible; the fact that most, if not all, of the grounds for challenging the credibility of Ms. Lashley's account of her activities on the morning of the robbery and murder were known to defendant's trial counsel before the entry of judgment against defendant; and the fact that the DNA evidence that defendant seeks to obtain in this case would not tend to undercut the credibility of Ms. Lashley's contention that defendant was one of the two men that she saw outside the Amoco station, we cannot conclude that the performance of the requested DNA testing would have had a material effect upon defendant's or a jury's evaluation of Ms. Lashley's credibility at the time that Judge Jenkins entered judgment in this case.

¶ 60     We are also unpersuaded that the availability of evidence tending to provide defendant with an alibi controls the resolution of the materiality issue that is before us in this case. All of the witnesses whom defendant claims can corroborate his alibi were available at the time that defendant decided to enter his guilty plea. In addition, the existence of evidence tending to show the presence of third-party DNA on the shell casings and projectile recovered from the Amoco station would not have had any additional impact upon an evaluation of the credibility of defendant's alibi witnesses given the fact that such evidence has little tendency to show that defendant was not

involved in the robbery of the Amoco station and the murder of Mr. Boyd. The same is true of the evidence concerning the robbery at the rest area, which has no clear relation to the issue of defendant's guilt or innocence of the robbery of the Amoco station and the murder of Mr. Boyd, particularly given the absence of any non-hearsay evidence concerning Mr. Terry's involvement in the commission of the crime which led to the entry of defendant's guilty plea, the fact that Mr. Terry has denied any involvement in the commission of this crime, and the fact that evidence implicating Mr. Terry does not tend to exculpate defendant given Ms. Lashley's claim to have seen two men leaving the Amoco station. *See Barnes*, 345 N.C. at 233.[14]

¶ 61     At the end of the day, this case is not materially different from *Lane*, in which the defendant was convicted of the kidnapping, rape, and first-degree murder of a five-year-old girl. *Lane*, 370 N.C. at 509, 513–14. In seeking postconviction DNA testing of hair samples taken from the trash bag in which the victim's body was discovered, the defendant in *Lane* argued that DNA testing "could potentially relate

---

[14] We do agree with defendant that the Court of Appeals should not have considered the fact that he entered a guilty plea in making the required materiality determination or treated it as "substantial evidence" of guilt in light of the fact that the relevant issue for purposes of requests for postconviction DNA testing submitted by persons who entered guilty pleas is whether the new evidence would have impacted defendant's decision to plead guilty in the first place. The same is true, however, of defendant's persistence in proclaiming his innocence and his reluctance to enter a plea of guilty. Instead, the required materiality determination should focus upon the strength of the substantive evidence of defendant's guilt and the likely impact that the results of the requested DNA testing would have had upon defendant's decision to plead guilty and upon defendant's chances for success at a subsequent trial on the merits.

to another perpetrator, and potentially the only perpetrator of [the] murder." *Id.* at 516. In rejecting the defendant's challenge to the trial court's determination that he had failed "to show that the requested postconviction DNA testing of hair samples [was] material to his defense," we pointed to "the additional overwhelming evidence of defendant's guilt presented at trial," the absence "of evidence at trial pointing to a second perpetrator," and "the inability of forensic testing to determine whether the hair samples at issue are relevant to establish a third party was involved" in the commission of the crimes for which the defendant was convicted. *Id.* at 516–20. In determining that, "even if the hair samples in question were tested and found not to belong to the victim or defendant, they would not necessarily implicate another individual as a second perpetrator," we emphasized the fact that the defendant had not shown that the hair samples had been put into the trash bag at the time of the crime and that "there was great potential for contamination of the hole-ridden, weathered trash bag." *Id.* at 522. Although the evidence of defendant's guilt in this case is not as strong as the evidence of the defendant's guilt in *Lane*, the relevance of the requested DNA evidence in the two cases is strikingly similar and suggests that the two cases should be resolved in the same manner.

¶ 62     The ultimate question that must be decided in resolving the materiality issue that is before use in this case is whether, all else remaining the same, a favorable DNA test result would have (1) probably caused defendant to refrain from pleading

guilty and (2) probably resulted in a verdict that was more favorable to defendant at any ensuing trial. After conducting the required analysis, we conclude that the presence of third-party DNA on the shell casings and projectile recovered from the Amoco station would have done little, if anything, to improve defendant's odds of achieving a more successful outcome than he actually obtained as a result of his guilty plea given the applicable legal standard, which focuses upon whether defendant actively participated in the robbery and murder that led to his conviction rather than upon whether defendant was the person that fired the fatal shots, and the fact that the availability of such evidence would had little tendency to show that defendant would have been better positioned to mount a successful defense to the charges that had been lodged against him or upon a jury's evaluation of the credibility and weight that should be given to the other available evidence, including the credibility of Ms. Lashley's testimony that she saw defendant leaving the Amoco station immediately after gunshots emanating from that location had been heard. As a result, we hold that the Court of Appeals did not err by concluding that defendant had failed to make the showing of materiality necessary to support an award of postconviction DNA testing.

## III.   Conclusion

¶ 63      Thus, for the reasons set forth above, we hold that a defendant who enters a plea of guilty is not statutorily disqualified from seeking postconviction DNA testing

pursuant to N.C.G.S. § 15A-269.  We further hold, however, that defendant has failed to establish that the requested DNA testing would be material to his defense in this case.  As a result, the decision of the Court of Appeals is affirmed.

AFFIRMED.

Justice BERGER did not participate in the consideration or decision of this case.

Chief Justice NEWBY concurring in the result.

I agree with the majority's ultimate decision to uphold the trial court's denial of defendant's motion to test DNA evidence. I write separately, however, because I would hold that a defendant who pleads guilty cannot prevail on a postconviction motion to test DNA evidence under N.C.G.S. § 15A-269.[1] Therefore, I concur in the result.

N.C.G.S. § 15A-269 provides in relevant part:

>    (a)    A defendant may make a motion before the trial court that entered the judgment of conviction against the defendant for performance of DNA testing and, if testing complies with FBI requirements and the data meets NDIS criteria, profiles obtained from the testing shall be searched and/or uploaded to CODIS if the biological evidence meets all of the following conditions:
>
>    (1)    Is material *to the defendant's defense*.
>
>    (2)    Is related to the investigation or prosecution that resulted in the judgment.
>
>    (3)    Meets either of the following conditions:
>
>        a.    It was not DNA tested previously.
>
>        b.    It was tested previously, but the requested DNA test would provide results that are significantly more accurate and probative of the identity of the perpetrator or accomplice or have a reasonable probability of

---

[1] Were I to reach the issue of whether defendant made the necessary showing of materiality in this case, I would agree with the majority's analysis, except for the majority's statement in footnote fourteen of its opinion.

contradicting prior test results.

> (b) The court shall grant the motion for DNA testing . . . upon its determination that:
>
> (1) The conditions set forth in subdivisions (1), (2), and (3) of subsection (a) of this section have been met;
>
> (2) If the DNA testing being requested had been conducted on the evidence, there exists a reasonable probability *that the verdict would have been more favorable to the defendant*; and
>
> (3) The defendant has signed a sworn affidavit of innocence.

N.C.G.S. § 15A-269 (2021) (emphases added). "The primary endeavor of courts in construing a statute is to give effect to legislative intent. . . . If the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 276–77 (2005) (citations omitted).

A plain reading of N.C.G.S. § 15A-269 demonstrates that a defendant who pleads guilty cannot meet the conditions necessary to prevail on a motion to test DNA evidence. First, a defendant who enters a guilty plea cannot show that "[i]f the DNA testing being requested had been conducted on the evidence, there exists a reasonable probability that the verdict would have been more favorable to the defendant." N.C.G.S. § 15A-269(b)(2). In order for a trier of fact to reach a verdict in a criminal case, there must first be a trial. *See State v. Hemphill*, 273 N.C. 388, 389, 160 S.E.2d

53, 55 (1968) ("A verdict is the unanimous decision made by the jury and reported to the court."). As such, the occurrence of a trial is a prerequisite to prevailing on a motion to test DNA evidence under N.C.G.S. § 15A-269(b)(2). When a defendant pleads guilty, no trial occurs, and thus no verdict is ever reached. Therefore, a defendant who pleads guilty can never meet the condition outlined in N.C.G.S. § 15A-269(b)(2).

¶ 67    Second, a defendant who enters a guilty plea cannot show that the relevant biological evidence "[i]s material to [his] defense." N.C.G.S. § 15A-269(a)(1). The phrase "material to the defendant's defense" presupposes that the defendant making the motion presented a defense before the trial court. Since a sample of biological evidence cannot be material to a defense that never occurred, a defendant who did not present a defense before the trial court cannot meet the condition outlined in N.C.G.S. § 15A-269(a)(1).

¶ 68    When a defendant pleads guilty, he fails to present a "defense" pursuant to N.C.G.S. § 15A-269(a)(1). In *State v. Sayre*, the "defendant pleaded guilty to fourteen counts of taking indecent liberties with a child, two counts of second[-]degree sexual offense, and two counts of felony child abuse." *State v. Sayre*, No. COA17-68, 2017 WL 3480951, at *1 (N.C. Ct. App. Aug. 15, 2017) (unpublished). The defendant later filed a motion to test DNA evidence which the trial court denied. *Id.* The Court of Appeals noted that the "defendant's bare assertion that testing the identified

evidence would 'prove that [he] is not the perpetrator of the crimes' is not sufficiently specific to establish that the requested DNA testing would be material to his defense." *Id.* at *2 (alteration in original) (citing *State v. Cox*, 245 N.C. App. 307, 312, 781 S.E.2d 865, 868–69 (2016)). The Court of Appeals also stated that "by entering into a plea agreement with the State and pleading guilty, defendant presented no 'defense' pursuant to N.C.[G.S.] § 15A-269(a)(1)." *Id.* As such, the Court of Appeals held "the trial court did not err by summarily denying defendant's request for post-conviction DNA testing." *Id.* The defendant appealed to this Court based upon the dissenting opinion at the Court of Appeals, and we issued a per curiam opinion affirming the Court of Appeals' decision. *State v. Sayre*, 371 N.C. 468, 818 S.E.2d 101 (2018) (per curiam).[2]

¶ 69    The majority asserts that the term "defense" is not "limited to the specific arguments that the defendant advanced before the trial court prior to his or her conviction." According to the majority, a "defense" includes "any argument that might have been available to a defendant to preclude a conviction or establish guilt for a lesser offense." The majority's primary support for this position is that the New

---

[2] The majority asserts that our per curiam opinion did not affirm the Court of Appeals' statement regarding the defendant's presentation of a "defense" because that issue was not on appeal. Notably, however, in his brief before this Court, the defendant in *Sayre* argued that his guilty plea should not preclude him from establishing materiality. In response, the State argued that based upon the plain language of the statute, it is impossible for a defendant who pleads guilty to show materiality. Nevertheless, even if our decision did not affirm the Court of Appeals' statement, the statement is still persuasive.

Oxford American Dictionary broadly defines "defense" as an "attempted justification or vindication of something." More specifically, however, Black's Law Dictionary defines "defense" as "[a] defendant's *stated reason* why the . . . prosecutor has no valid case; esp., a defendant's . . . plea <her defense *was* that she was 25 miles from the building at the time of the robbery>." *Defense*, *Black's Law Dictionary* (11th ed. 2019) (emphases added). This definition makes clear that a defendant's "defense" refers to the arguments that he actually made at trial. *See id.* Nonetheless, the majority adopts an overbroad definition of "defense" in an effort to expand the applicability of N.C.G.S. § 15A-269. The majority's interpretation effectively changes the statutory language from "material to the defendant's defense," N.C.G.S. § 15A-269(a)(1), to "material to any defense the defendant possibly could have presented, whether actually raised or not." Such an interpretation disregards this Court's duty to give "the words [of a statute] their plain and definite meaning." *Beck*, 359 N.C. at 614, 614 S.E.2d at 277.

¶ 70        Defendant here entered a guilty plea and indicated to the trial court that he was "in fact guilty." Due to defendant's guilty plea, a trier of fact did not reach a "verdict," and defendant never provided a "defense." Since defendant cannot meet the conditions outlined in N.C.G.S. § 15A-269(a)(1) and (b)(2), he is precluded from prevailing on his motion to test DNA evidence. Therefore, I concur in the result.

Justice BARRINGER joins in this concurring opinion.

Justice EARLS concurring in part and dissenting in part.

¶ 71      I concur fully in the portion of the majority opinion holding that defendants who enter a guilty plea are eligible to seek postconviction DNA testing under N.C.G.S. § 15A-269. In addition to the majority's careful and correct examination of the statutory text, the circumstances surrounding the statute's enactment, and the abundant evidence of legislative intent, the majority's description of the practical realities as experienced by criminal defendants faced with the choice between entering a guilty plea and going to trial illustrates why a statute titled "An Act to Assist an Innocent Person Charged With or Wrongly Convicted of a Criminal Offense in Establishing the Person's Innocence" cannot be read to categorically exclude defendants who have pleaded guilty. S.L. 2001-282, § 4, 2001 N.C. Sess. Laws 833, 837.

¶ 72      The majority notes that defendants " 'fear' that they will be treated more harshly if they insist upon pleading not guilty and going to trial." There is reason to believe defendants' fears are well-founded. *See, e.g.*, Brian D. Johnson, *Plea-Trial Differences in Federal Punishment: Research and Policy Implications*, 31 Fed. Sent. R. 256, 257 (2019) ("On average, trial conviction increases the odds of incarceration by two to six times and produces sentence lengths that are 20 to 60 percent longer. . . . Federal defendants are typically two to three times more likely to go to prison and receive incarceration terms from one-sixth to two-thirds longer, even after adjusting

for other relevant sentencing criteria. . . . [T]rial cases are twice as likely to result in imprisonment, with average sentences that are more than 50 percent longer." (citations omitted)); Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 923 (2004) ("At sentencing, trial judges are conditioned to punish defendants for claiming innocence (the logical extension of not accepting the prosecutor's plea bargain and sparing the State the expense of a jury trial) and for failing to express remorse or apologize for his wrongdoings."). Further, there is evidence that defendants who have experienced trauma or have been victimized themselves may be especially susceptible to pressure to plead guilty, even believing at the time that they are at fault despite there being legally cognizable defenses to exonerate them. *See* Andrew D. Leipold, *How the Pretrial Process Contributes to Wrongful Convictions*, 42 Am. Crim. L. Rev. 1123, 1125 n.8 (2005) ("Some defendants fail to assist in their defense or are willing to plead guilty because they are afraid, because they have no confidence in defense counsel, because they are trying to spare their loved ones the trauma of trial, or because they are mentally challenged."). As Justice Scalia observed, the plea-bargaining system "presents grave risks of prosecutorial overcharging that effectively compels an innocent defendant to avoid massive risk by pleading guilty to a lesser offense." *Lafler v. Cooper*, 566 U.S. 156, 185 (2012) (Scalia, J., dissenting). Thus, it should be no surprise that, for entirely rational and comprehensible reasons, actually innocent

people plead guilty. *See, e.g.*, Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 150–53 (2011) (noting that of the first 330 DNA exonerations, eight percent, or twenty-seven, had pleaded guilty).

¶ 73       Against this backdrop, it is fallacious to contend that allowing a defendant who has previously pleaded guilty to assert actual innocence would "make 'a mockery' of the General Assembly's postconviction DNA procedure." Our criminal justice system seeks finality, but it makes no pretenses to infallibility. Depriving defendants with credible actual innocence claims of an opportunity to demonstrate their innocence on the basis of a strained interpretation of a remedial statute is inconsistent with that statute and with the values our criminal justice system strives to uphold. Of course, the State has an interest in enforcing procedural mechanisms designed to filter out frivolous claims in order to promote the efficient administration of justice. But ultimately, the point is to administer *justice*, and there is no justice in consigning an actually innocent defendant to a life in prison or worse. To imply that such a defendant deserves his fate because he was one of the overwhelming majority of criminal defendants who resolve their case through plea bargaining is willfully blind to reality and to the problems the General Assembly set out to address in enacting N.C.G.S. § 15A-269.

¶ 74       However, while I agree with the majority that defendants who plead guilty are not categorically ineligible for postconviction DNA testing under N.C.G.S. § 15A-269,

I cannot join the majority in its conclusion that this defendant has failed to demonstrate materiality within the meaning of the statute. The majority is correct that N.C.G.S. § 15A-269(b) requires Alexander to demonstrate "a reasonable probability that the verdict would have been more favorable to the defendant" if the DNA evidence he seeks had been admitted at a trial. But the majority errs in its application of this standard in the present case.

Alexander did not, as the majority suggests, need to "provide sufficient evidence that he was not involved in the commission of second-degree murder in order to show materiality"—that is, the burden was not on Alexander to exculpate himself in order to establish his entitlement to DNA testing. At this stage of proceedings, under N.C.G.S. § 15A-269, a court is not deciding whether Alexander is actually innocent and should be released. The court is only deciding whether to allow postconviction DNA testing. Thus, in assessing materiality, the court considers the potential impact of the evidence had the evidence been available at the time Alexander entered his guilty plea, and at a subsequent trial where the burden would be on the State to prove his guilt beyond a reasonable doubt. If there is a reasonable probability that admission of the requested DNA evidence would cause Alexander not to plead guilty to second-degree murder and cause a jury not to find Alexander guilty of that crime, then he has satisfied his burden of proving materiality, regardless of whether or not he has brought forth affirmative evidence of his innocence at this time.

The majority correctly explains that " '[m]ateriality' as used in the statutory provisions governing postconviction DNA testing should be understood in the same way that 'materiality' is understood in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny." Yet the majority's application of the materiality standard in this case imposes a significantly heavier burden on Alexander than what *Brady* and its progeny require. For example, in *Kyles v. Whitley*, the United States Supreme Court explained that evidence can be material within the meaning of *Brady* even if it does not establish that there is insufficient evidence to sustain a defendant's conviction. 514 U.S. 419, 434–35 (1995) ("[M]ateriality . . . is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."). A defendant must demonstrate that the evidence creates "[t]he possibility of an acquittal on a criminal charge," not that there is "an insufficient evidentiary basis to convict." *Id.* at 435. Requiring defendants to prove their innocence at this stage of the proceedings is simply inconsistent with the materiality standard the majority purports to apply and its purpose, which is to weed out frivolous claims.

Applying the proper materiality standard, I would hold that Alexander has demonstrated a reasonable probability that he "would not have pleaded guilty and otherwise would not have been found guilty." *State v. Randall*, 259 N.C. App. 885, 887 (2018) (emphasis omitted). In assessing materiality, we assess the impact of the

DNA evidence "in the context of the entire record." *State v. Lane*, 370 N.C. 508, 519 (2018) (quoting *State v. Howard*, 334 N.C. 602, 605 (1993)). Here, the "context of the entire record" makes clear that the presence of another person's fingerprints on shell casings and a bullet found at the scene of Carl Boyd's killing is material within the meaning of N.C.G.S. § 15A-269.

¶ 78 With respect to Alexander's guilty plea, a court "is obligated to consider the facts surrounding a defendant's decision to plead guilty in addition to other evidence, in the context of the entire record of the case, in order to determine whether the evidence is 'material.' " *Randall*, 259 N.C. App. at 887. In this case, it is salient that at the time he pleaded guilty, Alexander was facing the death penalty, had no insight into potential weaknesses in the State's case, had an alibi defense corroborated by witness testimony, and was under the impression that he would serve ten years in prison if he agreed to the plea bargain being offered. What Alexander lacked at the time he entered his plea was any physical evidence tending to detract from the State's theory of the case that he was the shooter. Absent such evidence, the pressure to plead guilty rather than face a capital trial was overwhelming, regardless of the strength or weakness of the State's case. With DNA evidence that would, at a minimum, provide some evidentiary basis for Alexander's assertion that someone other than him was the shooter, there is a significantly greater chance that he would have been willing to forego the plea bargain and take his chances at trial.

Alternatively, evidence tending to detract from the State's theory of guilt might have caused prosecutors to offer a plea bargain presenting Alexander with more favorable terms on less serious charges.

¶ 79     Had Alexander proceeded to trial, DNA evidence demonstrating that another person handled shell casings and a projectile found at the crime scene would likely have had a significant effect on the jury's deliberations. *See Lane*, 370 N.C. at 519 ("The determination of materiality . . . hinges upon whether the evidence would have affected the jury's deliberations."). Again, while the presence of third-party DNA on the shell casings and projectile would not exclude the possibility that Alexander shot Boyd, it could reasonably have caused the jury to doubt the State's account of how Alexander supposedly perpetrated the crime, especially if Alexander's DNA was also not found on the shell casings and projectile. The majority's rejoinder is that Alexander still could have been convicted on an acting in concert theory of guilt "even if he had never personally held the weapon from which the fatal shots were fired," but there is at present no evidence in the record indicating that Alexander joined with another person "in a purpose to commit a crime." *State v. Barnes*, 345 N.C. 184, 233 (1997) (quoting *State v. Erlewine*, 328 N.C. 626, 637 (1991)). The State may have ultimately been able to negate the impact of the DNA evidence and secure Alexander's conviction for second-degree murder on an acting in concert theory, but it should be obvious that physical evidence supporting the inference that someone

other than Alexander pulled the trigger would be extremely relevant in Alexander's trial for second-degree murder.

¶ 80        The DNA evidence Alexander seeks would, if it shows what he believes it shows, provide evidentiary support for the reasonable determination that someone other than Alexander was the shooter. The evidence would not conclusively establish Alexander's innocence, but that is not the burden he must carry at this stage. Instead, he must only demonstrate that with the DNA evidence he seeks there would have been a reasonable probability that he would not have pleaded guilty to second-degree murder and would not have been convicted of the same had he proceeded to trial. Here, given that the State's case was not overwhelming, DNA testing "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 419. Accordingly, while I agree with the majority that Alexander and all defendants who plead guilty are eligible to seek DNA testing under N.C.G.S. § 15A-269, I would hold that evidence which could support the inference that a defendant convicted of second-degree murder was not the shooter is material within the meaning of that statute. Accordingly, I respectfully concur in part and dissent in part.